REAL ESTATE SALE AGREEMENT

This Real Estate Sale Agreement (this "Agreement") is made as of the 26th day of July, 2023 (the "Agreement Date"), by and between the Bankruptcy Estate of Chemetco Inc. ("Chemetco") and Mirly, LLC, a Texas Limited liability company ("Mirly", and collectively with Chemetco, "Seller"), and LKQ Midwest, Inc., a Delaware corporation ("Purchaser").

### Recitals

A.  WHEREAS, (i) Chemetco is the owner of that certain approximately one hundred twenty-four (124) acre parcel of real property located off New Poag Road and Illinois Route 3 comprised of tax parcels 18-1-14-16-00-000-007, 18-1-14-15-00-000-024, 18-1-14-16-00-000-006, 18-1-14-15-00-000-023, 18-1-14-16-00-000-005, 18-1-14-15-00-000-022, 18-1-14-15-00-000-021, 18-1-14-15-00-000-020, and portions of tax parcels 18-1-14-16-00-000-004, 18-1-14-15-00-000-028 and 18-1-14-15-00-000-026, and depicted on Exhibit A attached hereto (the "Chemetco Land"), and (ii) Mirly is the owner to that certain approximately one acre parcel of real property located off New Poag Road comprised of tax parcels 18-1-14-16-00-000-006 and 18-1-14-15-00-000-024, and depicted on Exhibit A attached hereto (the "Mirly Land", and collectively with the Chemetco Land, the "Land"), together with all improvements thereon and all of Seller's rights, titles and interests, if any, in and to all minerals, oil, gas and other hydrocarbon substances, all development rights and air rights, easements, licenses, rights-of-way, water rights (ground or surface) associated with or appurtenant to the Land, and all other appurtenances used in connection with the beneficial use and enjoyment of the Land and improvements (collectively, the "Real Property").

B.  WHEREAS, Seller desires to sell the Real Property, and Purchaser desires to buy the Real Property from Seller, all on the terms and conditions hereinafter set forth.

### Agreements

NOW, THEREFORE, for and in consideration of the Recitals set forth above, which are made a part of this Agreement by this reference, the mutual covenants and agreements contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller and Purchaser agree as follows:

1.  **PURCHASE PRICE**

The purchase price of the Real Property ("Purchase Price") shall be sum of (a) the product of Thirty-One Thousand Two-Hundred Fifty and No/100 Dollars ($31,250.00), multiplied by the acreage of the Chemetco Land (to the nearest one-tenth of an acre) as determined by the Survey (as defined in Section 4.2 below), and (b) Thirty-Five Thousand and No/100 Dollars ($35,000.00).

2.  **EARNEST MONEY**

Within five (5) business days after the Agreement Date, Purchaser shall deposit the sum of Fifty Thousand and No/100 Dollars ($50,000.00) (the "Initial Deposit") with First American Title Insurance Company, 30 North LaSalle Street, Suite 2700, Chicago, Illinois 60602, Attention:

1

Benjamin Packman (the "Escrow Agent"). If Purchaser shall fail to deliver the Initial Deposit within the time period provided for above, Seller may at any time prior to the delivery of the Initial Deposit, terminate this Agreement, in which case this Agreement shall be null and void ab initio and neither party shall have any further rights or obligations to the other hereunder. If Purchaser does not exercise the termination right set forth in Section 3.3 hereof, Purchaser shall, within five (5) business days after the end of the Due Diligence Period, as the same may be extended pursuant hereto, deposit with the Escrow Agent an additional Fifty Thousand and No/100 Dollars ($50,000.00) (the "Additional Deposit"). The Additional Deposit together with the Initial Deposit, and all earnings thereon, are referred to as the "Deposit". If desired and directed by Purchaser, the Deposit shall be held in an interest-bearing escrow account by Escrow Agent in an institution as directed by Purchaser. If the Closing (as that term is defined in Section 6.2 below) occurs, the Deposit shall be paid to Seller and credited against the Purchase Price at Closing. If the Closing does not occur in accordance with the terms hereof, the Deposit shall be held and delivered as hereinafter provided in this Agreement.

3. **DUE DILIGENCE PERIOD**

   3.1 **Due Diligence Period**. Purchaser shall have until ninety (90) days after the Agreement Date (the "Due Diligence Period") within which to conduct a due diligence review of the Real Property. Purchaser shall have the right, , to extend the Due Diligence Period for up to sixty (60) days by providing written notice thereof to Seller on or before the last day of the Due Diligence Period, solely for the purposes of (i) obtaining any Approvals (as that term is defined in Section 3.2 below) that Purchaser is not able to secure prior to the end of the initial ninety (90) day Due Diligence Period, and (ii) confirming the ability to obtain all necessary public utilities at the Real Property. Without limitation of the foregoing, Seller agrees to cooperate with Purchaser to allow Purchaser and/or the applicable utilities to cross over or under such property owned by Seller or an affiliate thereof as may be reasonably necessary for the purpose of providing utility service to the Real Property, including without limitation the granting of such easements as may be reasonably required for such purpose.

   Seller has previously provided Purchaser with copies of (a) all environmental, soil, engineering and other inspection reports with respect to the Real Property, (b) all permits and licenses affecting the Real Property, (c) information with respect to the zoning classification of the Real Property, including copies of special use permits, non-conforming use permits and variances, (d) the most recent assessments and real estate tax bills on the Real Property, (e) copies of existing surveys, title insurance policies and title insurance commitments (including legible copies of all underlying documents relating thereto) of the Real Property, (f) any letters or agreements with municipal agencies regarding the Real Property, (g) any existing lease agreements related to the Real Property and (h) other information regarding the condition, use or development of the Real Property, in each case to the extent such documents, reports and information are in the possession or control of Seller (collectively, the "Due Diligence Documents").

   In addition, Seller agrees that Purchaser and its agents shall have the right to enter onto the Real Property at any time after the Agreement Date, for purposes of performing surveying, boring, engineering, environmental, topographical, percolation, soil and any other work, studies or tests that Purchaser, in its sole discretion, deems necessary. Purchaser shall conduct such work, studies and tests so as to minimize any damage to the Real Property. Purchaser shall promptly repair any

2

damage to the Real Property caused by Purchaser or its agents in connection with such work, studies or tests. Purchaser shall indemnify and hold harmless Seller from any loss, cost, damage or expense arising from damage to the Real Property or any portion thereof or to property of third persons or claims for personal injuries to or death of any person as a result of such work, studies or tests to the extent caused by or resulting from the acts or omissions of Purchaser, its agents or contractors. Purchaser shall notify Seller prior to entry onto the Real Property and shall be responsible for acquiring all necessary permissions, permits or authorizations, if any, prior to conducting any of the above-described work, studies or tests.

Upon Seller's request (and regardless of whether this Agreement has been terminated or not), Purchaser shall furnish Seller with copies of any non-privileged, third-party reports relating to the Real Property (collectively, the "Reports"), including by way of example but not limitation, inspection reports, surveys, and environmental assessments; provided, however, Purchaser makes no representation or warranty related to the Reports (including no representation as to any of the information contained in the Reports).

Upon termination of this Agreement, Purchaser shall return to Seller all Due Diligence Documents provided to Purchaser from Seller

**3.2** <u>Approvals Contingency</u>. Without limiting the rights of Purchaser pursuant to Section 3.1 above, Purchaser's obligation to close the transaction contemplated by this Agreement is subject to and contingent upon Purchaser securing within the Due Diligence Period, all permits, licenses and approvals required to allow Purchaser to conduct the Intended Use, as that Term is defined in Section 5.5 hereof, on the Real Property as are desired or required by Purchaser in its sole and absolute discretion (the matters described above shall hereinafter be collectively referred to as the "Approvals"). Seller shall provide Purchaser with such cooperation and execute such documents as Purchaser may reasonably require in order to obtain the Approvals described above, including without limitation in connection with the assignment and transfer of any existing permits and licenses and Purchaser's efforts to obtain any additional permits and licenses which are necessary for the Intended Use. Prior to the end of the Due Diligence Period, as the same may be extended pursuant hereto, Purchaser shall advise Seller in writing of the existing permits and/or licenses, if any, that Purchaser desires to have assigned to Purchaser at Closing.

**3.3** <u>Purchaser's Option to Terminate</u>. In the event Purchaser determines, in Purchaser's sole and absolute discretion, which shall not be subject to question or review for any reason, that Purchaser is dissatisfied with the Real Property, Purchaser may at its option terminate the Agreement by giving written notice thereof to Seller prior to the end of the Due Diligence Period, as the same may be extended pursuant hereto, in which event the Deposit shall be promptly refunded to Purchaser and this Agreement shall terminate and be of no further force and effect except for those provisions which expressly survive such termination. If Purchaser does not give written notice of termination as provided for in the preceding sentence, then notwithstanding the provisions of Section 3.2 above, Purchaser shall be obligated to close the transaction; provided, that Purchaser shall have no obligation to close in the event of a Seller default under this Agreement.

**3.4** <u>As-Is</u>. Except as specifically provided in this Agreement (and any documents delivered by Seller at Closing to convey title to the Real Property), and except for Seller's

3

express representations and warranties in Article 5 and elsewhere in this Agreement, Seller will convey the Real Property to Purchaser at Closing in an "AS-IS," "WHERE-IS" condition "WITH ALL FAULTS," without any warranty whatsoever to Purchaser as to the condition of any portion of the Real Property or as to any other matter. Except with respect to any claims arising out of any breach of the representations or warranties expressly set forth in Article 5 or elsewhere in this Agreement, Purchaser, for itself and its agents, affiliates, successors and assigns, hereby releases and forever discharges Seller, its agents, partners, affiliates, successors and assigns from any and all rights, claims and demands at law or in equity, whether known or unknown at the time of this Agreement, which Purchaser has or may have in the future, arising out of the physical, environmental, economic or legal condition of the Real Property. Purchaser hereby specifically acknowledges that Purchaser has carefully reviewed this section and discussed its import with legal counsel and that the provisions of this section are a material part of this Agreement.

4.  TITLE AND SURVEY

    4.1    Title Commitment. Within forty-five (45) days after the Agreement Date, Purchaser shall obtain a title commitment (the "Title Commitment") issued by First American Title Insurance Company (the "Title Company"), dated on or after the Agreement Date, for an ALTA Form 2006 owner's policy in the amount of the Purchase Price, showing Purchaser as the proposed insured and covering title to the Real Property on or after the date of this Agreement, showing title to the Real Property in Seller, subject to the general terms and conditions contained therein and general real estate taxes not yet due and payable (the "Permitted Exceptions"), and showing customary exceptions for recorded easements and rights of way. The Title Commitment shall include legible copies of all documents shown in the Title Commitment as exceptions to title. Prior to the end of the Due Diligence Period, Purchaser shall deliver to Seller a copy of the pro forma ALTA owner's title insurance policy, including all endorsements, issued by Title Company (the "Title Pro Forma").

    4.2    Survey. Within sixty (60) days after the Agreement Date, Purchaser shall obtain a survey of the Real Property dated on or after the date of this Agreement, prepared by a licensed Illinois land surveyor and certified by such surveyor to Purchaser and the Title Company as having been prepared in accordance with 2016 ALTA Urban survey standards, with such Table A requirements as Purchaser may reasonably require (the "Survey").

    4.3    Exceptions. Within ten (10) business days after Purchaser's receipt of the latter of the Title Commitment and the Survey, Purchaser may deliver to Seller or Seller's attorney written notice ("Title Objection Notice") that sets forth any objections to the Title Commitment (as updated from time to time) or the Survey. Any title exception or Survey matter to which Purchaser does not object in writing within such time period shall constitute a Permitted Exception. Seller will have five (5) business days (the "Cure Period") following receipt of any Title Objection Notice in which to remedy the matters raised therein ("Title Defects") or to obtain title insurance at Seller's expense insuring over and against the Title Defects, and provide evidence reasonably satisfactory to Purchaser thereof. If Seller fails to remedy the Title Defects or obtain such title insurance within the Cure Period, Purchaser will have the option, exercisable on or before the later of (i) five (5) business days from the expiration of the Cure Period or (ii) the expiration of the Due Diligence Period, as the same may be extended, to (a) waive any or all of the Title Defects, and proceed with this Agreement with no

reduction in the Purchase Price, in which event such waived Title Defects shall be deemed Permitted Exceptions, or (b) give written notice to Seller of Purchaser's election to terminate this Agreement, in which event the Deposit shall be refunded to Purchaser and thereupon neither party shall have any further rights or obligations to the other hereunder other than those obligations which expressly survive such termination. Notwithstanding the foregoing, (i) Seller shall be obligated to and shall remove on or before Closing all monetary liens and judgments, and all taxes due and payable as of the Closing Date, regardless of whether the same are raised in a Title Objection Notice, and (ii) Purchaser shall accept as a Permitted Exception the matters set forth in Exhibit B attached hereto (including the rights of the Environmental Protection Agency or similar agency to enter upon and inspect the Real Property under the provision of CERCLA Sections 101(40) and 107(r), 42 U.S.C 9601(40) and 9607(r)).

5. SELLER'S REPRESENTATIONS AND WARRANTIES

Seller represents and warrants to Purchaser as follows:

5.1 **Good Standing**. Mirly is duly organized and validly existing under the laws of its state of organization, is in good standing and is duly qualified to do business in the State of Illinois.

5.2 **Authority**. Seller has full capacity, right, power and authority to execute, deliver and perform this Agreement and all documents to be executed by Seller pursuant hereto, and all required action and approvals therefore have been duly taken and obtained. The individuals signing this Agreement and all other documents executed or to be executed pursuant hereto on behalf of Seller are and shall be duly authorized to sign the same on Seller's behalf and to bind Seller thereto. This Agreement and all documents to be executed pursuant hereto by Seller are and shall be binding upon and enforceable against Seller in accordance with their respective terms.

5.3 **Information**. The information included in the documents to be delivered to Purchaser pursuant to Section 3.1, and other information about the Real Property furnished to Purchaser by or on behalf of Seller, shall, to the best of Seller's knowledge, be true, correct and complete in all material respects, and the same shall not omit any material information required to make the submission thereof fair and complete.

5.4 **Title and Possession**. Seller owns fee simple title to the Real Property. Except for Seller, and the year-to-year farm lease covering all or a part of the Real Property (the "Farm Lease"), which Farm Lease expires no later than December 1, 2023, there are no persons in possession or occupancy of the Real Property or any part thereof. Prior to Closing, Seller shall not renew or extend the term of Farm Lease beyond December 1, 2023.

5.5 **Zoning**. Seller makes no representation or warranty as to any zoning restriction on the Real Property that would limit or prohibit its use or development as a vehicle salvage yard and such other lawful uses as are customarily or incidentally related thereto (the "Intended Use").

5.6 **Litigation**. There are no claims, causes of action or other litigation or proceedings pending or, to the best of Seller's knowledge, threatened with respect to the ownership, occupancy, or operation of the Real Property or any part thereof (including disputes with the holder of any mortgages, governmental authorities, utilities, contractors or adjoining land owners).

5

5.7   **Violation of Legal Requirements.**  With respect to the Real Property, Seller has not received any notice of any violations of any laws, statutes, codes, acts, ordinances, orders, judgments, decrees, injunctions, rules, regulations, permits, licenses, authorizations, directions or requirements of any government or governmental authority having jurisdiction of the Real Property or the operation thereof ("Legal Requirements") that have not been heretofore entirely corrected.

5.8   **Government Action.**  There is no existing or, to the best of Seller's knowledge, threatened or anticipated: (a) widening, change of grade or limitation on use of streets abutting the Real Property; (b) special tax or assessment to be levied against the Real Property; (c) change in the zoning classification of the Real Property; (d) change in the tax assessment of the Real Property; or (e) condemnation or eminent domain proceedings with respect to the Real Property.

5.9   **Environmental Matters.**  *Intentionally omitted.*

5.10   **No Violation of Anti-Terrorism Laws.**  The following statements are and shall be true, correct and complete without material misrepresentation or omission: (i) Seller is not a Prohibited Person (as defined below), (ii) Seller is in compliance with the Anti-Terrorism Laws (as defined below), (iii) Seller does not conduct any business or engage in any transaction or dealing with any Prohibited Person, or deal in, or otherwise engage in any transaction relating to, any property or interests in property blocked pursuant to Executive Order 13224 (as defined below), and (iv) Seller has established policies and procedures designed to prevent and detect money laundering, including processes to meet all applicable anti-money laundering requirements of the USA Patriot Act (as defined below).  For purposes of the foregoing representations and warranties: (1) "Anti-Terrorism Laws" are any laws related to terrorism or money laundering, including Executive Order 13224 and the USA Patriot Act, and any regulations promulgated under either of them, (2) "Executive Order 13224" is defined as Executive Order Number 13224 on Terrorism Financing, effective September 24, 2001, (3) "Prohibited Person" is defined as (a) a person or entity subject to the provisions of Executive Order 13224; (b) a person or entity owned or controlled by, or acting for or on behalf of, an entity that is subject to the provisions of Executive Order 13224; (c) a person or entity with whom Purchaser or Seller is prohibited from dealing by any of the Anti-Terrorism Laws; (d) a person or entity that commits, threatens or conspires to commit or supports "terrorism" as defined in Executive Order 13224; (e) a person or entity that is named as a "specially designated national and blocked person" on the most current list published by the U.S. Treasury Department's Office of Foreign Assets Control; or (f) a person or entity who is affiliated with a person or entity described in clauses (a) through (e) immediately above, and (4) "USA Patriot Act" is defined as the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, H.R. 3162, Public Law 107-56, as may be amended from time to time.

5.11   **Other Representations and Warranties.**  All representations and warranties of Seller appearing in other Articles and Sections of this Agreement are true and correct.

6.   **CLOSING**

6.1   **Escrow Instructions.**  Following the execution of this Agreement, the parties shall deposit a copy of an executed counterpart of this Agreement with Escrow Agent and this

6

instrument shall serve as the instructions to Escrow Agent for consummation of the purchase and sale contemplated hereby. Seller and Purchaser agree to execute such additional and supplementary escrow instructions as may be appropriate to enable Escrow Agent to comply with the terms of this Agreement; provided, however, that in the event of any conflict between the provisions of this Agreement and any supplementary escrow instructions, the terms of this Agreement shall control.

**6.2** **Sale of Property**. The closing of the sale of the Real Property in accordance with this Agreement (the "Closing") shall take place at the local office of the Title Company on the date that is thirty (30) days after the end of the Due Diligence Period, as the same may be extended (the "Closing Date"). Notwithstanding the foregoing, Purchaser shall have the right, prior to Closing, to waive any and all contingencies set forth in this Agreement upon written notice to Seller (a "Waiver Notice"), in which event the Closing Date shall occur thirty (30) days after Seller's receipt of the Waiver Notice. At Closing Seller agrees to convey the Real Property to Purchaser on the terms and conditions set forth herein. Closing may take place by the electronic conveyance of signatures on the Closing documents, except that the parties shall timely provide original signed copies of all documents to be recorded or as otherwise required by the Title Company.

**6.3** **Payment of Purchase Price**. At Closing, Purchaser shall pay the balance of the Purchase Price, after the credit of the Deposit and such other prorations, adjustments and credits required or contemplated under this Agreement.

**6.4** **Conveyance of Property by Seller**. Seller shall (a) cause title to that portion of the Real Property owned by Chemetco to be conveyed to Purchaser by Bankruptcy Court authorized Trustee's Deed (the "Trustee's Deed"), and (b) cause title to that portion of the Real Property owned by Mirly to be conveyed to Purchaser by special warranty deed (the "Mirly Deed"), each in recordable form, subject only to the Permitted Exceptions. In addition, at Closing Seller shall assign to Purchaser all existing permits and licenses requested by Purchaser pursuant to Section 3.2 hereof, to the extent the same are transferable.

**6.5** **Possession**. Seller shall deliver full and exclusive possession of the Real Property to Purchaser at the Closing, free and clear of all leases, tenancies and occupancies, and in substantially the same condition as of the Agreement Date, subject to damage caused by Purchaser or Purchaser's agents, contractors or employees.

**6.6** **Prorations**. Real estate taxes and other state or city taxes, charges, assessments and special assessments affecting the Real Property not yet due and payable (collectively, "Real Estate Taxes") and utility charges, if any, shall be prorated as of 11:59 p.m. on the day immediately preceding the Closing Date based on the most recent real estate tax or assessment bill. At the Closing, the amount of prorations and adjustments as aforesaid shall be determined or estimated to the extent practicable, and monetary adjustment shall be made between Seller and Purchaser. All such prorations shall be final.

7. **SELLER'S COVENANTS**

Seller covenants that between the Agreement Date and the Closing Date:

7

**7.1** **Service Contracts**. Seller will not enter into any contracts for the provision of services or materials to the Real Property.

**7.2** **Insurance**. Seller will maintain in full force and effect until Closing the liability insurance policies now in effect with respect to the Real Property.

**7.3** **Tax Proceedings**. Seller will not withdraw, settle, or otherwise compromise any protest or reduction proceeding affecting real estate taxes assessed against the Real Property for the tax year in which the Closing is to occur or any subsequent tax year without the prior consent of Purchaser, which consent will not be unreasonably delayed or withheld.

**7.4** **Transactions**. From the date of Seller's acceptance hereof to the Closing Date or earlier termination of this Agreement, Seller shall operate and maintain the Real Property in the same manner as it has been operated and maintained heretofore; provided that during said period, Seller shall not do, suffer or permit, or agree to do, any of the following:

    (a) sell, encumber or grant any interest in the Real Property or any part thereof in any form or manner whatsoever, or otherwise perform or permit any act which will diminish or otherwise affect Purchaser's interest under this Agreement or in or to the Real Property or which will prevent Seller's full performance of its obligations hereunder; or

    (b) except as provided in Section 3.2 above, take any action that affects the zoning classification of the Real Property or the ability of Purchaser to conduct the Intended Use, or construct its proposed improvements, on the Real Property.

**7.5** **Maintenance of Real Property**. Seller, at Seller's sole cost and expense, shall maintain or cause to be maintained the Real Property free from waste and neglect and in as good order and repair as of the date hereof and shall keep and perform or cause to be performed all obligations of the owner of the Real Property or its agents under all Legal Requirements, to and including the Closing Date or termination of this Agreement. Subject to Closing and Section 8 hereof, on the Closing Date Seller shall tender possession of the Real Property to Purchaser in the same condition as the Real Property was in when last inspected by Purchaser, except for ordinary wear and tear, and condemnation (provided Purchaser shall not have elected to terminate this Agreement pursuant to Section 8 as a result of such condemnation or casualty).

**7.6** **Notice**. Seller shall notify Purchaser promptly if Seller becomes aware of any transaction or occurrence prior to the Closing Date that would make any of Seller's representations and warranties contained in this Agreement not true in any material respect.

**8. CONDEMNATION AND CASUALTY**

**8.1** **Condemnation**. If, subsequent to the date hereof and prior to the Closing Date, any authority having the right of condemnation or eminent domain commences negotiations with Seller or commences a proceeding against Seller for the damaging, taking or acquiring of all or any part of the Real Property, either temporarily or permanently, by condemnation or by exercise of the right of eminent domain, Seller will immediately give notice thereof to Purchaser. Purchaser

8

WH

may, within thirty (30) days after receipt of such notice, elect either (a) to terminate this Agreement, at which time the Deposit promptly shall be refunded to Purchaser, or (b) to close the transaction contemplated hereby, in which event Purchaser shall be entitled to participate in any negotiations regarding such proceeding. Seller shall not, without Purchaser's consent, which consent may be withheld in Purchaser's sole and absolute discretion, agree to any condemnation, taking or the granting of any easement or right of way affecting the Real Property, including without limitation the granting of any rights to the Army Corps of Engineers or any local municipality for a levee or berm on any part of the Real Property. At the Closing, Seller shall assign to Purchaser all of Seller's right, title and interest in and to the proceeds of any condemnation award.

**8.2** <u>Event of Casualty</u>. If, prior to Closing, the Real Property or any part thereof, shall be destroyed or damaged by fire or other casualty, then Seller shall promptly so notify Purchaser in writing. In the event of any such casualty, Purchaser may, within fifteen (15) days after receipt of Seller's notice, in its sole and absolute discretion, either (a) terminate this Agreement, at which time the Deposit promptly shall be refunded to Purchaser, or (b) close the transaction contemplated hereby, in which event, at Purchaser's sole discretion, Seller shall either (i) repair such damage to the reasonable satisfaction of Purchaser prior to Closing or (ii) Purchaser shall be entitled to either (x) a credit against the Purchase Price in an amount equal to the cost of repair, as reasonably estimated by Purchaser, or (y) settle the loss under all policies of insurance applicable to the destruction or damage and receive the proceeds of insurance applicable thereto, and Seller shall credit Purchaser for the amount of all deductibles under any insurance policies and for the amount of any uninsured loss, and further shall execute and deliver to Purchaser all required proofs of loss, assignments of claims and other similar items.

## 9. DELIVERIES AT CLOSING

**9.1** <u>Seller</u>. At the Closing, Seller shall deliver or cause to be delivered to Purchaser, in execution, form and substance reasonably satisfactory to Purchaser, each of the following instruments and documents:

(a) the Trustee's Deed and the Mirly Deed, each in recordable form;

(b) transfer tax declarations, affidavits or returns required for payment of applicable state, local and municipal real estate transfer taxes;

(c) a certificate certifying that the representations and warranties of Seller as set forth in this Agreement are true and correct as of the Closing Date;

(d) a certificate that Seller is not a "foreign person" as defined in the Federal Foreign Investment in Real Property Tax Act of 1980, as amended, in a form complying with such Act;

(e) such documents as the Title Company may reasonably require in order to issue the Title Policy;

(f) an assignment of the permits and licenses, if any, to be assigned to Purchaser pursuant to Section 6.4 (the "Assignment"); and

9

    (g)    such other documents and instructions as may be required by statute, by any other provision of this Agreement or as may reasonably be required by Purchaser or the Title Company to carry out the terms and intent of this Agreement.

**9.2** **Purchaser**. At the Closing, Purchaser shall deliver, or cause to be delivered to Seller, in execution, form and substance reasonably satisfactory to Seller, each of the following:

    (a)    the balance of the Purchase Price payable in immediately available funds, after the credit of the Deposit and such other prorations, adjustments and credits required or contemplated under this Agreement;

    (b)    a counterpart of the Assignment, if any, executed by Purchaser; and

    (c)    such other documents and instruments as may be required by any other provision of this Agreement or as may reasonably be required by Seller or the Title Company to carry out the terms and intent of this Agreement.

## 10. PAYMENT OF COSTS AND EXPENSES

**10.1** **Seller**. Seller shall pay all State of Illinois and county realty transfer taxes, fifty percent (50%) of the Closing and escrow fees, all fees for releasing liens and encumbrances and recordation thereof, and all costs for the owners Title Policy in the amount of the Purchase Price.

**10.2** **Purchaser**. Purchaser shall pay the cost of any endorsements to the Title Policy, the Title Commitment, fifty percent (50%) of the Closing and escrow fees, the entire cost of the Survey and the cost of recording the Deed.

**10.3** **Unallocated Costs and Expenses**. Other costs, charges, and expenses shall be paid as provided in this Agreement, or in the absence of such provision, in accordance with custom. Except as otherwise provided in this Agreement, each party shall pay its own legal, accounting and other professional service fees.

## 11. DEFAULT

**11.1** **Default by Seller**. In the event the Closing does not occur as provided herein by reason of the default of Seller, which default Seller fails to cure within seven (7) days after written notice thereof from Purchaser, Purchaser may elect, as the sole and exclusive remedy of Purchaser, either to (i) terminate this Agreement and receive the Deposit from the Escrow Agent, in which event Seller shall also reimburse Purchaser for all actual, out-of-pocket expenses incurred by Purchaser in connection with the transaction contemplated by this Agreement, including without limitation all due diligence, legal and other costs and expenses; or (ii) enforce specific performance of the obligations of Seller under this Agreement. If Purchaser does not specify its choice of remedy, then Purchaser shall be deemed to have elected to terminate this Agreement (as provided in subsection (i) above) if it fails to commence a cause of action for specific performance against Seller on or before 60 days after the originally scheduled Closing Date (taking into account any previously exercised extensions of the Due Diligence Period). Notwithstanding the foregoing, nothing contained herein shall limit Purchaser's remedies at law or in equity as to any obligations

10

which expressly survive such termination. This Section 11.1 shall survive a termination of this Agreement.

    **11.2**   **Default by Purchaser.** In the event the Closing does not occur as provided herein by reason of any default of Purchaser, which default Purchaser fails to cure within seven (7) days after written notice thereof from Seller, Seller may elect to terminate this Agreement, without further liability on Seller's part, in which event the Deposit then held by Escrow Agent shall be paid to Seller, as liquidated damages, and not as a penalty, as a fair and reasonable sum to recompense Seller in light of Seller's removal of the Real Property from the market and the costs incurred, labor and services performed and the loss of its bargain, all of which are difficult to ascertain. The payment of the Deposit as liquidated damages is not intended to be a forfeiture or penalty, but is intended to constitute liquidated damages to Seller. Notwithstanding the foregoing, nothing contained herein shall limit Seller's remedies at law or in equity as to any obligations which expressly survive such termination. This Section 11.2 shall survive a termination of this Agreement.

_____            _____
    SELLER'S INITIALS                       PURCHASER'S INITIALS

## 12. BROKER

    **12.1**   **Representations and Warranties.** Seller represents and warrants to Purchaser that Seller has not dealt with any broker, salesperson, agent or finder in this transaction, other than Barber Murphy ("Broker"), and Purchaser represents and warrants to Seller that Purchaser has not dealt with any broker, salesperson, agent or finder in this transaction. Seller shall pay a any and all commissions owed to Broker in connection with the transaction contemplated by this Agreement.

    **12.2**   **Indemnities.** Subject to Section 12.1 hereof, Seller agrees to indemnify, defend and hold Purchaser free and harmless, and Purchaser agrees to indemnify, defend and hold Seller free and harmless, of, from and against any and all losses, damages, liabilities, costs and expenses (including, without limitation, court costs and reasonable attorneys' fees and expenses) that the other party may suffer as a result of any claims made or suits brought by any broker, salesperson, agent or finder, who claims (a) to have been retained by the indemnifying party in connection with this transaction, or (b) to be the procuring cause of this transaction, provided in either case, that the party seeking indemnification has not in fact dealt with any such broker or finder.

## 13. NOTICES

Any and all notices, requests, demands or other communications hereunder shall be in writing and shall be deemed properly served (i) on the date sent if transmitted by hand delivery with receipt therefor, (ii) on the date of transmittal by email if sent prior to 5:00 p.m. Pacific time, and, if sent after such time, on the next business day, (iii) on day after the notice is deposited with an overnight courier for next day delivery, or (iv) three (3) days after being sent by registered or certified mail, return receipt requested, first class postage prepaid, addressed as follows (or to such new address as the addressee of such a communication may have notified the sender thereof):

11

|  |  |
|---|---|
| To Seller: | Chemetco Inc.<br>226 W. Main Street, Suite 102<br>Belleville, IL 62220<br>Attn: Don Sampson, Trustee<br>Email: donsam1947@gmail.com |
| With a copy to: | Mirly, LLC<br>5070 Mark IV Parkway<br>Fort Worth, TX 76106<br>Attn: John D. Harvison<br>Email: johnnyharvison@gmail.com |
| To Purchaser: | LKQ Midwest, Inc.<br>c/o LKQ Corporation<br>500 West Madison Street<br>Suite 2800<br>Chicago, Illinois 60661<br>Attn: Andrew Andreasik<br>Email: axandreasik@lkqcorp.com |
| If to Escrow Agent: | First American Title Insurance Company<br>30 South LaSalle Street, Suite 2700<br>Chicago, Illinois 60602<br>Attention:<br>Email: |

or to such other address(es) or addressee(s) as any party entitled to receive notice hereunder shall designate to the others in the manner provided herein for the service of notices. Rejection or refusal to accept or inability to deliver because of changed address or because no notice of changed address was given, shall be deemed receipt.

## 14. CLOSING CONDITIONS

**14.1** **Conditions to Obligations of Purchaser.** The obligations of Purchaser under this Agreement to purchase the Real Property shall be subject to the satisfaction of the following conditions on or before the Closing Date, except to the extent that any of such conditions may be waived by Purchaser in writing at Closing.

    14.1.1 Possession of the Property. Delivery by Seller of exclusive possession of the Real Property, subject only to the Permitted Exceptions.

    14.1.2 Representations and Warranties. All of Seller's representations and warranties shall remain true and accurate in all material respects.

12

14.1.3 <u>Performance</u>. Seller shall have duly performed, in all material respects, each and every covenant and agreement to be performed by Seller pursuant to this Agreement.

14.1.4 <u>Title Policy</u>. The Title Company shall be irrevocably and unconditionally committed to issue an ALTA owner's title insurance policy pursuant to the Title Commitment, subject only to the Permitted Exceptions and otherwise in the form of the Title Pro Forma (the "Title Policy").

14.1.5 <u>Subdivision</u>. Seller shall have completed the subdivision of tax parcels 18-1-14-16-00-000-004, 18-1-14-15-00-000-028 and 18-1-14-15-00-000-026, such that the Real Property can be conveyed to Purchaser in compliance with all applicable Legal Requirements without the conveyance of those portions of the foregoing tax parcels that are not contemplated to be part of the Real Property, and such that the portions of such tax parcels conveyed to Purchaser shall constitute separate and distinct tax parcels including only the relevant portion(s) of the Real Property conveyed to Purchaser.

The failure of any of the aforesaid conditions in any material respect shall entitle Purchaser, at its option, upon notice to Seller and opportunity to cure as allowed in Section 11.1, to terminate this Agreement, in which event the Deposit shall be returned to Purchaser and, to the extent such failure results from a default by Seller of any of its covenants, obligations, representations or warranties under this Agreement, Section 11.1 shall apply.

**14.2  Conditions to Obligations of Seller.**  The obligations of Seller under this Agreement to sell the Real Property shall be subject to the satisfaction of the following conditions on or before the Closing Date, except to the extent that any of such conditions may be waived by Seller in writing at Closing.

14.2.1 <u>Performance</u>. Purchaser shall have duly performed, in all material respects, each and every covenant and agreement to be performed by Purchaser pursuant to this Agreement.

14.2.2 <u>Representations and Warranties</u>. All of Purchaser's representations and warranties shall remain true and accurate in all material respects.

The failure of any of the aforesaid conditions in any material respect shall entitle Seller, at its option, upon notice to Purchaser and opportunity to cure as allowed in Section 11.2, to terminate this Agreement, and to the extent such failure results from a default by Purchaser of any of its covenants, obligations, representations or warranties under the Agreement, Section 11.2 shall apply.

**15. MISCELLANEOUS**

**15.1  Entire Agreement.**  This Agreement contains the entire agreement and understanding of the parties with respect to the subject matter hereof, and all prior agreements, understandings and negotiations pertaining to the subject matter hereof are superseded by and

13

merged into this Agreement. This Agreement may not be amended, modified or discharged, except by an instrument in writing signed by the party to be bound thereby.

     **15.2**   **Waiver**. No waiver of any provisions or condition of this Agreement by any party shall be valid unless in writing signed by such party. No such waiver shall be taken as a waiver of any other or similar provision or of any future event, act, or default.

     **15.3**   **Time of Essence**. Time is of the essence of this Agreement. In the computation of any period of time provided for in this Agreement or by law, the day of the act or event from which said period of time runs shall be excluded, and the last day of such period shall be included, unless it is a Saturday, Sunday or legal holiday, in which case the period shall be deemed to run until the end of the next day which is not a Saturday, Sunday, or legal holiday.

     **15.4**   **Severability**. In the event any provision of this Agreement shall be unenforceable in whole or in part, such provision shall be limited to the extent necessary to render the same valid, or shall be excised from this Agreement, as circumstances require, and this Agreement shall be construed as if said provision had been incorporated herein as so limited, or as if said provision had not been included herein, as the case may be.

     **15.5**   **Headings**. Headings of paragraphs are for convenience of reference only, and shall not be construed as a part of this Agreement.

     **15.6**   **Binding Effect**. This Agreement and all of the provisions hereof shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, devisees, legatees, executors, administrators, successors, assigns, and legal representatives. All parties signing this Agreement on behalf of Seller shall be jointly and severally liable for all obligations of Seller hereunder.

     **15.7**   **Termination of Agreement**. If at any time this Agreement is terminated as provided herein, then this Agreement, except for the indemnity and other obligations contained in Article 5 and Sections 3.1, 11.1, 11.2, 12.1, 12.2, 15.12, 15.13 and 15.14 hereof which shall survive such termination, shall be null and void. The indemnities and other obligations described in Article 5 and Sections 3.1, 11.1, 11.2, 12.1, 12.2, 15.13 and 15.14 hereof shall survive Closing.

     **15.8**   **Counterparts**. This Agreement may be executed in any number of identical counterparts, any or all of which may contain the signatures of less than all of the parties, and all of which shall be construed together as a single instrument.

     **15.9**   **Drafting**. This Agreement is deemed to have been drafted jointly by the parties, and any uncertainty or ambiguity shall not be construed for or against any party as a result of the attribution of drafting to any party.

     **15.10**   **Choice of Law**. This Agreement shall be governed by and construed in accordance with the laws of the State of Illinois and the jurisdiction and venue for any disputes shall be in the Bankruptcy Court for the Southern District of Illinois.

     **15.11**   **Assignment**. Seller and Purchaser agree that Purchaser may assign any or all of its rights and obligations under this Agreement any entity that controls, is controlled by or is under

14

common control with Purchaser. Subject to the foregoing, this Agreement shall inure to the benefit of and shall be binding upon Seller and Purchaser and their respective successors and assigns. Purchaser shall be liable for any taxes incurred upon the assignment or transfer of this Agreement.

**15.12 Confidentiality.** Purchaser and Seller expressly acknowledge and agree that the transactions contemplated by this Agreement and the terms, conditions and negotiations concerning the same shall, during the Due Diligence Period, be held in the strictest confidence by such parties and shall not be disclosed except to their respective legal counsel, surveyor, title company, broker, accountants, design professionals, contractors, utility providers, consultants, officers, partners, directors and shareholders, lender, lender's attorneys and employees, members, investors, joint venture partners (the "Authorized Representatives") and as required to advance Purchaser's efforts to obtain the Approvals. After the Due Diligence Period until Closing, the Purchase Price shall remain confidential until the date of Closing, except as release of such information may be required by any applicable Legal Requirements, including Purchaser disclosures and filings to the Securities and Exchange Commission. Each party hereto agrees that it shall instruct each of its Authorized Representatives to maintain the confidentiality of such information. Nothing contained in this Section 15.12 shall preclude or limit either party from disclosing or accessing any information otherwise deemed confidential under this Section 15.12 in connection with the party's enforcement of its rights following a disagreement hereunder or in response to lawful process or subpoena or other valid or enforceable order of a court of competent jurisdiction. The provisions of this Section 15.12 shall survive any termination of this Agreement.

**15.13 Prevailing Party.** Should either party employ an attorney to enforce any of the provisions hereof, (whether before or after Closing, and including any claims or actions involving amounts held in escrow), the non-prevailing party in any final judgment agrees to pay the other party's reasonable expenses, including reasonable attorneys' fees and expenses in or out of litigation and, if in litigation, trial, appellate, bankruptcy or other proceedings, expended or incurred in connection therewith, as determined by a court of competent jurisdiction. The provisions of this Section 15.13 shall survive Closing and/or any termination of this Agreement.

**15.14 Waiver of Trial by Jury.** The respective parties hereto shall and hereby do waive trial by jury in any action, proceeding or counterclaim brought by either of the parties hereto against the other on any matters whatsoever arising out of or in any way connected with this Agreement, or for the enforcement of any remedy under any statute, emergency or otherwise.

**15.15 Tax Deferred Exchange.** In the event Seller elects to complete a 1031 exchange, Purchaser will cooperate with Seller to consummate such exchange; provided that Purchaser shall not be required to incur any additional obligation, liability or expenses in complying with this requirement. In the event Purchaser elects to complete a 1031 exchange, Seller will cooperate with Purchaser to consummate such exchange; provided that Seller shall not be required to incur any additional obligation, liability or expenses in complying with this requirement. In no event shall either party's 1031 exchange delay the Closing Date or the end of the Due Diligence Period, or be a condition of Closing.

**15.16 Bankruptcy Court Approval.** The parties hereto acknowledge and agree that the Real Property is a part of the bankruptcy estate in certain bankruptcy proceedings involving Chemetco, Inc., and that the sale of the Real Property from Seller to Buyer pursuant to this

15

Agreement is subject to approval by the United State Bankruptcy Court for the Southern District of Illinois, the court that is overseeing said bankruptcy proceedings ("Bankruptcy Court"). Seller shall within five (5) days after the Agreement Date file with the Bankruptcy Court for approval of the sale and provide Buyer a copy of the order approving the sale when entered.

*[End of Document – Signatures on the Following Page]*

IN WITNESS WHEREOF, this Agreement has been executed on the date first above written.

PURCHASER:

LKQ MIDWEST, INC., a Delaware corporation

By: *Walter Hanley*
Its: *Vice President*

SELLER:

BANKRUPTCY ESTATE OF CHEMETCO, INC.,

By: *[signature]*
Its: *Trustee in bankruptcy*

MIRLY, LLC

By: *[signature]*
Its: *Pres.*

EXHIBT A

THE REAL PROPERTY



EXHIBIT B

NOTICE TO INTERESTED PERSONS

The United States District Court for the Southern District of Illinois entered a Consent Decree on September 13, 2013, relating to the Property (the "Consent Decree"). **[Note: Please provide a copy of the Consent Decree at your earliest possible convenience.]** Capitalized terms used herein but not otherwise defined herein shall have the meanings ascribed to them in the Consent Decree. Pursuant to Section 18 of the Consent Decree, the Trustee shall undertake the following actions to alert prospective purchases of the status of the Estate's property:

(1) Within sixty (60) days after the Effective Date, the Trustee shall place on the land records of Madison County, Illinois, a notice which:

(A) states that the real property compromising the Chemetco Facility and Chemetco Hartford Property are subject to the Consent Decree;

(B) references the recorded location of the Consent Decree and any restrictions applicable to the real property that is subject to the Consent Decree;

(C) requires all future deeds, titles, or other instruments conveying an interest in the real property comprising the Chemetco Facility and the Chemetco Site to replicate such notice; and

(D) states that persons proposing to acquire an interest in the real property that is covered by Paragraph 17 of the Consent Decree will be subject to the provisions of CERCLA Sections 101(40) and 107(r), 42 U.S.C. §§ 9601(40) and 9607(r), and that any requirements set forth therein must be satisfied before a sale is executed.

(2) The Trustee and any Successor-In-Title shall, at lease sixty (60) days prior to the conveyance of an interest in the real property comprising the Chemetco Facility or Chemetco Site to any party other than Paradigm or a successor to Paradigm, provide a non-electronic copy of the Consent Decree to each person and provide a written notice of the proposed sale or lease to the Agencies, including the name and address of the prospective grantee/lessee, and the date on which a copy of the Consent Decree was given to the prospective grantee/lessee.

19